[No. D057004. Fourth Dist., Div. One. Sept. 22, 2011.]

GOLDEN HILL NEIGHBORHOOD ASSOCIATION, INC., et al., Plaintiffs and Appellants, v.
CITY OF SAN DIEGO, Defendant and Appellant.

418

COUNSEL

Charles R. Khoury, Jr., for Plaintiffs and Appellants.

Jan I. Goldsmith, City Attorney, and Carmen A. Brock, Deputy City Attorney, for Defendant and Appellant.

OPINION

**IRION, J.**—In August 2007, the City of San Diego (the City) formed a special assessment district known as the Greater Golden Hill Maintenance Assessment District (the District) for the purpose of providing various services and improvements for the benefit of properties in the District. The same month, Golden Hill Neighborhood Association, Inc.—an association of property owners in the Golden Hill area—and individual property owner John

McNab[1] filed a lawsuit challenging the legality of the District and its initial assessments under article XIII D of the California Constitution,[2] which was enacted by the voters' passage of Proposition 218 in 1996. The Association filed a second suit in 2008 challenging the District's assessment charges for fiscal year 2008–2009 and decision to carry over to that fiscal year unspent funds from the assessments collected for fiscal year 2007–2008. The court consolidated the two actions and tried the case on documentary evidence and the parties' oral argument. The trial court entered judgment for the Association on the first cause of action, "For Writ of Mandamus," in their 2007 complaint and entered judgment for the City on every other cause of action in the Association's consolidated pleadings.

The City and the Association both appeal the judgment. The City appeals the portion of the judgment in favor of the Association on its initial mandamus cause of action, contending the formation of the District and the special assessments levied by the District complied with all of the requirements of article XIII D. The Association appeals the portion of the judgment in favor of the City, contending, among other things, that the District should be dissolved because (1) there would not have been a majority of votes in favor of its formation if the voting weight assigned to the City's open space and parkland in the District had not been improperly inflated; (2) the services and improvements for which the assessment was levied do not confer special benefit on the assessed properties; and (3) as the trial court ruled, the engineer's report supporting the assessment failed to separate general benefits from special benefits as required by article XIII D.[3]

We conclude that the Association's challenge to the vote establishing the District is meritorious and that the trial court correctly ruled that the required engineer's report supporting the District assessments failed to adequately separate general benefits from special benefits as required by article XIII D.

---

[1] Although plaintiff McNab apparently is not a member of Golden Hill Neighborhood Association, Inc., for ease of reference we will refer to both plaintiffs collectively as the Association.

[2] All further article references are to the California Constitution.

[3] The Association also contends that certain 2003 amendments to the San Diego Municipal Code conflict with article XIII D and are invalid; the City is judicially estopped to assert that services and improvements listed in the Property and Business Improvement District Law of 1994 (Sts. & Hy. Code, § 36600 et seq.) provide special benefit to real property under article XIII D; declaratory and injunctive relief is necessary to remedy numerous ongoing violations of article XIII D; very few of the proposed services and improvements provide special benefit and proportionality; the assessment roll incorrectly lists the street frontage for hundreds of single-family residences; the City failed to credit property owners with unspent assessed funds from fiscal year 2007–2008 and unlawfully used those funds for increased expenditures without voter approval; and invalid assessment charges cannot be separated from valid charges because the assessment engineer's report fails to state individual cost items. These contentions are either moot or immaterial in light of our disposition.

Accordingly, we direct the issuance of a writ of mandate vacating the resolution establishing the District and invalidating the assessments levied by the District.

## ARTICLE XIII D

Because the City's appeal and the Association's appeal raise the same essential issue—whether the formation of the District and the District's assessments comply with the requirements of article XIII D—we begin with an overview of article XIII D to provide a proper context for the factual and procedural background of the case.

■ Article XIII D limits a local government's ability to levy special assessments against real property. The California Supreme Court has explained that "[a] special assessment is a ' " ' "compulsory charge placed by the state upon real property within a pre-determined district, made under express legislative authority for defraying in whole or in part the expense of a permanent public improvement therein . . . [.]" ' [Citation.]" [Citation.] In this regard, a special assessment is "levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement." [Citation.] "The rationale of special assessment[s] is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefited should not be subsidized by the general public. [Citation.]" [Citation.] . . . [¶] A tax, on the other hand, is very different. Unlike a special assessment, a tax can be levied " 'without reference to peculiar benefits to particular individuals or property.' " [Citation.] Indeed, "[n]othing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied." [Citations.] . . . [¶] Therefore, while a special assessment may, like a special tax, be viewed in a sense as having been levied for a specific purpose, a critical distinction between the two public financing mechanisms is that a special assessment must confer a special benefit upon the property assessed beyond that conferred generally.' " (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 442 [79 Cal.Rptr.3d 312, 187 P.3d 37] (*Silicon Valley*).)

■ In passing Proposition 218 and enacting article XIII D, "the voters clearly sought to limit local government's ability to exact revenue under the rubric of special assessments." (*Silicon Valley, supra,* 44 Cal.4th at p. 446.) Article XIII D "restricts government's ability to impose assessments in several important ways. First, it tightens the definition of the two key findings necessary to support an assessment: special benefit and proportionality. An

assessment can be imposed *only* for a 'special benefit' conferred on a particular property. (Art. XIII D, §§ 2, subd. (b), 4, subd. (a).) A special benefit is 'a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large.' (Art. XIII D, § 2, subd. (i).) The definition specifically provides that '[g]eneral enhancement of property value does not constitute "special benefit." ' (*Ibid.*) Further, an assessment on any given parcel must be in proportion to the special benefit conferred on that parcel: 'No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel.' (Art. XIII D, § 4, subd. (a).) 'The proportionate special benefit derived by each identified parcel shall be determined in relationship to the entirety of the capital cost of a public improvement, the maintenance and operation expenses of a public improvement, or the cost of the property-related service being provided.' (*Ibid.*) ▮ Because only special benefits are assessable, and public improvements often provide both general benefits to the community and special benefits to a particular property, the assessing agency must first 'separate the general benefits from the special benefits conferred on a parcel' and impose the assessment only for the special benefits. (Art. XIII D, § 4, subd. (a).) [¶] Second, . . . [article XIII D] established strict procedural requirements for the imposition of a lawful assessment." (*Silicon Valley*, at p. 443.)

Under article XIII D, "local agencies must give the record owners of all assessed parcels written notice of the proposed assessment, a voting ballot, and a statement disclosing that a majority protest will prevent the assessment's passage. (Art. XIII D, § 4, subds. (c), (d).) The proposed assessment must be 'supported by a detailed engineer's report.' (Art. XIII D, § 4, subd. (b).) At a noticed public hearing, the agencies must consider all protests, and they 'shall not impose an assessment if there is a majority protest.' (Art. XIII D, § 4, subd. (e).)" (*Silicon Valley, supra*, 44 Cal.4th at p. 438.) "A majority protest exists if, upon the conclusion of the hearing, ballots submitted in opposition to the assessment exceed the ballots submitted in favor of the assessment. In tabulating the ballots, the ballots shall be weighted according to the proportional financial obligation of the affected property." (Art. XIII D, § 4, subd. (e).)

The California Supreme Court noted in *Silicon Valley* that "[b]efore Proposition 218 was passed, courts reviewed quasi-legislative acts of local governmental agencies, such as the formation of an assessment district, under a deferential abuse of discretion standard." (*Silicon Valley, supra*, 44 Cal.4th at p. 443.) "The drafters of Proposition 218 specifically targeted this deferential standard of review for change. Article XIII D, section 4, subdivision (f), provides: 'In any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on

the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question.' " (*Id.* at p. 444.) A local agency's burden of proving that an assessment meets these requirements is to be liberally construed and "courts should exercise their independent judgment in reviewing local agency decisions that have determined whether benefits are special and whether assessments are proportional to special benefits within the meaning of [article XIII D]." (*Id.* at pp. 448, 450.)

## FACTUAL AND PROCEDURAL BACKGROUND

In 2006, the Greater Golden Hill Community Development Corporation (GGHCDC) received a grant to explore the possible formation of a maintenance assessment district (MAD) in the Golden Hill area of San Diego. After holding two community meetings, GGHCDC mailed surveys to 3,550 Golden Hill property owners to gauge support for the formation of the District. Seventy-five percent of the 650 surveys returned to GGHCDC expressed support for the creation of a MAD. The City then retained the engineering firm SCI Consulting Group (SCI) to prepare the engineer's report that is required to form a MAD under the Landscaping and Lighting Act of 1972, codified at Streets and Highways Code section 22500 et seq.[4] (Sts. & Hy. Code, §§ 22565, 22586.)

In June 2007, the city council (City Council) passed a resolution stating its intention to form the District and collect assessments "to pay a prescribed portion of the costs of future improvements, maintenance and/or services of those items described in the Engineer's Report for [the District]." The City Council preliminarily approved SCI's engineer's report and directed the city clerk to set a date for a public hearing on the proposed formation of the District and mail "assessment ballots" to the property owners in the District area at least 45 days before the hearing. On July 30, 2007, the City Council held a public hearing on the formation of the District and counted the ballots received from property owners. Of the 1,182 valid ballots the City received, 635 were in favor of forming a MAD and 547 were opposed. The vote for each property was weighted according to the proposed amount of the assessment to be levied against the property as specified in the engineer's report and attached assessment roll. The total assessment amount of $228,502.72 attributable to the 1,182 voting properties consisted of "yes" votes in the amount of $123,266.56 and "no" votes in the amount of $105,236.16. Thus, formation of a MAD was approved by 53.95 percent of the weighted vote. Based on those voting results, the City Council passed

---

[4] As noted, article XIII D, section 4, subdivision (b) also requires that "[a]ll assessments shall be supported by a detailed engineer's report prepared by a registered professional engineer certified by the State of California."

resolution No. R-302887 ordering formation of the District, approving the engineer's report, and confirming assessments against properties in the District in the total amount of $488,890 for fiscal year 2007–2008, as estimated in the engineer's report.

The engineer's report[5] states that the purpose of the District is to provide funding for debris and litter removal, enhanced litter containers, sidewalk sweeping, sidewalk power washing, trash removal, landscaping services, graffiti removal, and trail and canyon beautification. The report further describes the services and improvements to be provided by the District as "[i]nstallation, maintenance and servicing of public improvements and incidental expenses, including but not limited to landscaping, sprinkler systems, shrubs and trees, sidewalks, gutters, water, street lighting, signage and materials, supplies, utilities and equipment, as applicable, for property within the District, and any incidental costs thereto . . . ."

The engineer's report divides the District into "Benefit Zone 1" and "Benefit Zone 2." The report specifies the following services to be provided in zone 1 twice a week: sidewalk sweeping and weeding, graffiti removal, litter removal, street light inspections and reports, and enhanced trash receptacles with regular emptying. The report next specifies the following services to be provided in zone 1 as needed: large bulk item pickup, removal of illegal dumping, removal of public health and sanitation hazards, and barricading of sidewalk and safety hazards. The report states that zone 2 will receive sidewalk sweeping and weeding, and litter removal twice a month, and the following services as needed: graffiti removal, street light inspections and reports, large bulk item pickup, removal of illegal dumping, removal of public health and sanitation hazards, and barricading of sidewalk and safety hazards. Both zone 1 and zone 2 are to be provided basic landscaping and tree maintenance services as needed, and the following "enhanced service and maintenance" as needed: sidewalk power washing, infrastructure improvements, clock maintenance, and equipment. Both zones will also receive trail beautification services as needed and canyon beautification services quarterly. The report calls for the installation and maintenance of decorations and banners in zone 1 and, for both zones, newsletter and Web site information and special events.

The engineer's report explains that the special benefit to each parcel was apportioned based on the parcel's linear square footage, stating: "Each property is assigned a single family equivalent benefit factor (SFE). The SFE for each single [f]amily home is 1, and [SFE's for other properties] are based

---

[5] The engineer's report for the fiscal year 2008–2009 assessment is substantially identical to the initial engineer's report for the 2007–2008 assessment. All of the report provisions noted in this opinion are included in both reports.

upon the relative intensity of use (trip factors) in relation to a single family home." The report assigned SFE's (single-family equivalent benefit factors) of 0.7 to multifamily residences and condominiums, 0.0032 per square foot to commercial properties, and 1.0 to vacant properties, churches and parking lots.

The engineer's report concluded that "[s]ince building size/parcel area, property type and linear frontage are good determinates of relative benefit to property, and since the population density in the Greater Golden Hill area (and height of buildings) is average for an urbanized area, a 75/25 split of the assessments based on property's single family equivalent benefit units (SFE) versus linear frontage is deemed to be reasonable. Therefore, 75% of the assessments are allocated based on SFE and 25% are allocated based on street frontage." Significantly, as to publicly owned parcels, the report states: "An assessment has been levied upon each publicly owned parcel in the same manner as privately owned property. Each publicly owned parcel, *except parks or designated open space area*, has been assessed on the same basis as other parcels within the District."[6] (Italics added.)

### *The Consolidated Actions*

On August 31, 2007, the Association filed a "Petition for Peremptory Writ of Mandate and Complaint for Declaratory and Injunctive Relief" (the 2007 complaint) "to enforce the provisions of [article XIII D], and challenge the decision of . . . the City Council . . . to overrule protests of real property owners and approve the Assessment Engineer's Report, and approve formation of the [District]." The first cause of action of the 2007 complaint concerned 2003 amendments to San Diego Municipal Code section 65.0202 defining what constitutes an "improvement" for which a MAD may be formed. The Association alleged that most of the items listed in that definition

---

[6] The City requests that we take judicial notice of a document entitled ."Golden Hill Community Plan." The City states that "the sole purpose the City has referenced the Community Plan in its Opening Brief . . . is for factual background purposes only unrelated to the issues to be determined on appeal." The Association requests that we "authenticate and take judicial notice of color photos, showing the use and location of several parcels of City-owned property included in the [District]." We deny the City's and the Association's requests for judicial notice on the ground the materials in question are unnecessary to our resolution of the appeal. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29 [79 Cal.Rptr.3d 489].)

Additionally, the City moves to strike various documents in the Association's respondents' appendix and all references to those documents in cross-appellant's opening brief on the grounds the documents were not part of the superior court file and are irrelevant to the issues in this appeal. We deny the motion to strike, but disregard any parts of the Association's brief and appendix containing matters that are irrelevant or outside the proper scope of the record on appeal. (See Cal. Rules of Court, rule 8.204(e)(2)(C).)

of "improvement" were adopted from the Property and Business Improvement District Law of 1994 and were not intended to provide special benefit to real property under article XIII D. The Association requested an order enjoining the City from levying assessments for maintenance and improvement services listed in San Diego Municipal Code section 65.0202 and issuance of a writ of mandate commanding the City to comply with the requirements of article XIII D and Streets and Highways Code section 22573.[7]

The second cause of action of the 2007 complaint challenged the legality of the vote that established the District, asking the trial court to "adjudicate and determine that the fair assessed value of all City-owned real property located within the boundaries of the [District] be reduced in weighted dollar valuation, in compliance with the requirements of Streets and Highways Code Section 22573, and [article XIII D, section 4, subdivision (a)]." In the complaint's prayer for relief, the Association requested an order dissolving the District if the trial court determined that "the weighted value of the 'yes votes' cast after fair apportionment of the City vote is less than the weighted value of the 'no votes' cast in the July 30, 2007, election."

The third cause of action alleged that the engineer's report failed to separate general from special benefits. The Association asked the court to enjoin the City from levying assessments within the District "without fairly separating general from special benefits, and assessing only for special benefit[s]."

Thus, the 2007 complaint essentially presented the following three claims: (1) that the services and improvements for which the District levied assessments against properties in the District did not provide special benefit to the properties as required by article XIII D; (2) that the District should be dissolved because the voting that established it was unlawfully weighted; and (3) that the engineer's report did not adequately separate the general benefits from the special benefits to be conferred on the District properties and imposed the assessment only for the special benefits, as required by article XIII D, section 4, subdivision (a).[8]

---

[7] Streets and Highways Code section 22573 states: "The net amount to be assessed upon lands within an assessment district may be apportioned by any formula or method which fairly distributes the net amount among all assessable lots or parcels in proportion to the estimated benefits to be received by each such lot or parcel from the improvements. [¶] The determination of whether or not a lot or parcel will benefit from the improvements shall be made pursuant to the Improvement Act of 1911 (Division 7 (commencing with Section 5000))."

[8] In their briefing on appeal, the Association suggests that the trial court should have granted declaratory and injunctive relief invalidating the 2003 amendments to San Diego Municipal Code sections 65.0201 and 65.0202. However, the Association did not request such relief in their 2007 complaint or allege that the amendments are unconstitutional or invalid. They

In June 2008, the City Council approved a special assessment for the District for the 2008–2009 fiscal year, with a proposed budget of $489,012. On July 25, 2008, the Association filed its second "Petition for Peremptory Writ of Mandate and Complaint for Declaratory and Injunctive Relief" (the 2008 complaint) challenging the City Council's approval of the 2008–2009 assessment and engineer's reports for the District and certain other MAD's. The 2008 complaint raised the following issues: (1) whether the District properly credited and applied surplus funds it collected for the 2007–2008 fiscal year to the assessment for the 2008–2009 fiscal year; (2) whether the District violated California law by not submitting any of the new and increased expenditures in its 2008–2009 budget to property owners for their vote of approval; and (3) whether the 2008 engineer's report adequately separated general benefits from special benefits to real property.

### The Judgment

The judgment states: "Petitioners' First Cause of Action for Writ of Mandate in [the 2007 complaint] is granted with judgment entered thereon in favor of Petitioners." The effect of this language is unclear because the 2007 complaint did not request a writ commanding or prohibiting any specific action by the City; it simply requested writs broadly commanding the City to comply with article XIII D and various statutes. Further, the judgment does not direct the issuance of a writ or otherwise specify any particular mandamus relief, and there is no indication in the record that any writ ever issued. Consequently, it is uncertain whether the trial court intended to invalidate the *formation* of the District or simply invalidate the 2007 assessments levied by the District as being unauthorized by article XIII D.[9]

---

simply claimed that most of the items listed in the definition of "improvement" in San Diego Municipal Code section 65.0202 were adopted from the Property and Business Improvement District Law of 1994 and were not intended to provide "special benefit" to real property under article XIII D and, therefore, any assessments for such items violate article XIII D and should be enjoined.

[9] Case law is unclear as to whether a judicial determination invalidating an initial assessment imposed in a newly formed assessment district necessarily invalidates the *formation* of the assessment district established to levy the assessment. (Compare *Silicon Valley, supra*, 44 Cal.4th at pp. 457–458 [concluding assessment was invalid for failure to meet the requirements of Prop. 218 but not addressing the validity of the assessment district] with *Beutz v. County of Riverside* (2010) 184 Cal.App.4th 1516, 1532–1538 [109 Cal.Rptr.3d 851] (*Beutz*) [directing entry of judgment vacating resolution creating assessment district where intended assessment was invalid for failure to separate general from special benefits conferred on assessed properties] and *Not About Water Com. v. Board of Supervisors* (2002) 95 Cal.App.4th 982, 986 [116 Cal.Rptr.2d 526], disapproved on another point in *Silicon Valley*, at p. 450 [mandamus proceeding by property owners challenging as constitutionally flawed *the formation* of an assessment district *and subsequent levy of an assessment* on the real property in the district].) The City appears to interpret the judgment in favor of the Association on the mandamus cause of action of the 2007 complaint as invalidating the formation of the District and not as simply

The trial court explained its reasoning for its decision as to some of the Association's claims in a written "Ruling" that is referenced in and attached to the judgment. Regarding its decision in favor of the Association on the cause of action for writ of mandate in the 2007 complaint, the court ruled that the City failed to show in the initial engineer's report that the 2007 assessment was based upon special benefits conferred on each parcel. The court ruled that the special benefits identified in the report were for the general enhancement of the District and did not "suffice as special benefits," and that the report did "not address special benefits as applicable to each parcel." The court further ruled that the engineer's report failed to distinguish between general benefits and special benefits conferred on the District.

As noted, the trial court ruled against the Association and in favor of the City on each of the Association's other causes of action in their consolidated pleadings. Thus, the judgment, including the attached written ruling, appears to uphold the 2008 assessment even though the defects the court found in the engineer's report in granting the Association unspecified mandamus relief (failure to show special benefit and separate general benefits from special benefit) are present in both the 2007 and 2008 engineer's reports.[10]

## Validity of the Vote Establishing the District

Because the validity of a special assessment imposed by a local agency is a constitutional question after the passage of Proposition 218, we exercise our independent judgment in determining whether such an assessment complies with article XIII D. (*Silicon Valley, supra*, 44 Cal.4th at pp. 448, 450.) Accordingly, we review de novo whether the vote establishing the District and special assessment met the requirements of article XIII D. As the California Supreme Court has noted, "it is undisputed that courts can invalidate elections that are conducted contrary to the provisions of

---

invalidating the assessments imposed for fiscal year 2007–2008. Although a judicial determination that an initial assessment imposed in a newly formed assessment district is invalid under article XIII D may invalidate formation of the assessment district, we need not decide whether an invalid initial assessment necessarily invalidates formation of the assessment district in all cases.

[10] It is unclear why the court ruled on any of the Association's 2008 claims on the merits, since each of them challenges the validity of the District's 2008 assessments and is therefore moot in light of the court's determination that deficiencies in the 2007 engineer's report, *which remained unchanged in the 2008 engineer's report*, rendered the District's assessments invalid under article XIII D. To the extent the court's rejection of the Association's 2008 claims can be viewed as an implied finding that the District's 2008 assessment met all of the requirements of article XIII D, the finding is inconsistent with the court's grant of unspecified mandamus relief on the grounds "the City failed to demonstrate the assessment is based upon special benefits conferred on each parcel," and failed to distinguish "between general benefits and special benefits conferred on the District."

Proposition 218." (*Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 299 [109 Cal.Rptr.3d 620, 231 P.3d 350] (*Greene*).)

■ Article XIII D, section 4, subdivision (e) requires that the voting on a proposed special assessment be weighted "according to the proportional financial obligation of the affected property." This proportionality provision of subdivision (e) is directly tied to the proportionality requirement of article XIII D, section 4, subdivision (a), which provides that the proportionate special benefit conferred upon each assessed parcel must be determined in relationship to the entire cost of a public improvement or service, and that the amount of the assessment imposed on any parcel may not exceed the reasonable cost of that proportionate special benefit.

The principle that a property owner's vote on a proposed special assessment is to be weighted according to the owner's proportional share of total assessment amount—the owner being granted one vote for each dollar assessed against his or her property—is rooted in Proposition 218's fundamental purpose of requiring *taxpayer consent* for any new assessment, fee or charge levied by local government. This fundamental purpose was expressly stated in the preamble to Proposition 218, which reads: " 'The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to *require voter approval of tax increases.* However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of *voter approval* for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers *without their consent.*' " (*Silicon Valley, supra,* 44 Cal.4th at p. 446, italics added, quoting Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 2, p. 108.) Proposition 218 further stated that " '[t]he provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and *enhancing taxpayer consent.*' " (*Silicon Valley,* at p. 448, italics added, quoting Ballot Pamp., Gen. Elec., *supra,* text of Prop. 218, § 5, p. 109.)

■ Proposition 218's weighted voting requirement, set forth in article XIII D, section 4, subdivision (e), enhances taxpayer consent by giving property owners whose properties are proposed to be assessed in amounts greater than other owners' properties a proportionately greater say as to whether the proposed assessment will be instituted. As the California Supreme Court noted in *Greene,* "the one-person, one-vote requirement rooted in the state and federal equal protection provisions do not apply to fee and assessment elections conducted by limited purpose government agencies that *disproportionately affect certain property owners.*" (*Greene, supra,* 49

Cal.4th at p. 297, fn. 8, italics added.) An election on whether to institute a special assessment that will disproportionately affect property owners must be conducted by use of the weighted voting system prescribed by article XIII D, section 4, subdivision (e).

As required by article XIII D, section 4, subdivision (e), the vote for each privately owned property in the District was weighted according to the amount of the proposed assessment to be levied against that property, as set forth in the engineer's report and attached assessment roll. The engineer's report explained that the special benefit to each parcel was apportioned based on the parcel's linear square footage. The report also assigned each property an SFE factor based on its relative intensity of use (trip factors) in relation to a single-family home, and based 75 percent of the property's assessment amount on its SFE number and the remaining 25 percent on its street frontage. Regarding publicly owned properties, the engineer's report stated that "[e]ach publicly owned parcel, *except parks or designated open space area*, has been assessed on the same basis as other parcels within the District." (Italics added.) However, the engineer's report did not then specify an SFE for park and open space land or explain how the assessment amount and corresponding vote weighting for such properties was calculated. The assessment roll attached to the engineer's report listing all of the assessed properties and their SFE numbers and assessment amounts included 89 City properties with assigned SFE's of 4.6 and with varying assessment amounts, presumably due to varying sizes. The City conceded at trial that these parcels are open space.[11] The assessed properties that the City voted with an SFE of 4.6 also included a parcel consisting of a portion of Balboa Park.[12]

Under article XIII D, it is the City's burden to show that the contested assessment amounts charged against its park and open space parcel are "proportional to, *and no greater than*, the benefits conferred on [those properties]." (Art. XIII D, § 4, subd. (f), italics added.) The City has not met that burden. We have thoroughly reviewed the entire trial court and administrative record, including the 2007 and 2008 engineer's reports for the District, and are unable to determine from that review how the contested assessment amounts charged against the City's park and open space parcels were calculated, or whether they were proportional to the special benefits, if any, to be conferred on those parcels, as required by article XIII D, section 4, subdivision (a). To the extent the assessment amounts charged against the

---

[11] The City's counsel stated: "Of the 95 parcels the City owns [in the District], 90 of them are open space." The Association notes on appeal, and the City does not dispute, that 89 of these parcels are open space and one consists of a portion of Balboa Park. The assessment roll shows a street address for only one of the 89 open space parcels.

[12] The Balboa Park property was not listed in the 2007 assessment roll, but is listed in the 2008 roll with the address of "3020 Zoo," an SFE of 4.6, and the assessment amount of $2,255.28.

City's park and open space parcels exceeds the reasonable cost of the proportionate special benefit conferred upon those parcels, the vote for those parcels was overweighted and the vote for the other properties in the District was diluted. Such disproportionate vote weighting would violate the requirement that the ballots for the voting properties be weighted "according to the proportional financial obligation of the affected property" (art. XIII D, § 4, subd. (e)) and deprive the owners of underweighted properties the full say to which they are entitled regarding the imposition of a special assessment.

Government Code section 53753, which was "designed to clarify the implementation of Proposition 218" (*Greene, supra,* 49 Cal.4th at p. 286), provides that "[d]uring and after the tabulation, the assessment ballots and the *information used to determine the weight of each ballot* shall be treated as disclosable public records, as defined in [Government Code] Section 6252, and [made] equally available for inspection by the proponents and the opponents of the proposed assessment." (Gov. Code, § 53753, subd. (e)(2), italics added.) Under that statute, the City was required to publicly disclose how the SFE and assessment amounts for the City's park and open space properties were calculated, whether it did so in the engineer's report or elsewhere.[13]

■ When a local agency owns a substantial amount of property subject to a special assessment, its failure to publicly disclose the basis for the determination of the proposed assessment amounts to be charged against its parcels invites the sort of mischief the Association suggests the City committed in this case—i.e., the agency could overassess its own properties without public scrutiny for the purpose of obtaining a majority affirmative vote on the special assessment.[14] Here, the City's failure to publicly disclose how the SFE and assessment amounts for the City's park and open space properties were calculated compromised the transparency and integrity of the election process by depriving other property owners in the District the opportunity to review and challenge the vote weighting for those properties.

[13] The California Supreme Court has noted that "[a]ssessment statutes, including the Landscaping and Lighting Act, typically require legislative bodies, prior to levying an assessment, to conduct noticed public hearings and to publicly review and approve an *engineer's report* of the cost of improvements and the *method of apportioning costs.* (See [Sts. & Hy. Code,] §§ 22550–22595.)" (*Knox v. City of Orland* (1992) 4 Cal.4th 132, 147, fn. 21 [14 Cal.Rptr.2d 159, 841 P.2d 144], italics added.)

[14] Although it is generally counterintuitive to view a property owner as having an incentive to defend, rather than challenge, an assessment amount that exceeds the reasonable cost of the proportional special benefit conferred on the owner's property, a local agency could have the incentive to overassess its own property for the purpose of vote weighting "in this era of chronic budget deficits and massive shortages of funds for public services." (*Concerned Citizens for Responsible Government v. West Point Fire Protection Dist.* (2011) 196 Cal.App.4th 1427, 1442 [127 Cal.Rptr.3d 783] (conc. opn. of Butz, J.).)

In its reply brief, the City addresses the Association's "accusation" that the assessment engineer overassessed the City-owned parcels within the District to ensure adequate votes to form the District. The City asserts, in its words, that "it has continually rebutted this false accusation by demonstrating [that] the City, a municipal corporation and property owner within the [District], has carried a substantial portion of the [District] assessment burden, paying approximately $35,000 or more per year of the estimated $488,890 [District] budget annually since its inception." However, the amount of the City's overall assessment burden is immaterial to whether the amount assessed against, and corresponding vote weight given to, any particular City parcel was properly determined. What is material to that issue is whether the particular assessment amount is proportional to the special benefit conferred on the property. A local agency could view $35,000 in special assessment charges as a small price to pay to shift over $400,000 in costs for improvements and services that would otherwise have to be paid from its general revenues to the property owners in a special assessment district.

At trial, the City's counsel asserted the City's open space parcels were not assigned SFE's of 4.6 as a "voting tactic," but were assigned that SFE because they require a lot of debris removal and landscape maintenance that other parcels do not require. However, there is no evidence or analysis in the record to support counsel's assertion—i.e., there is no evidence that the City's park and open space parcels would receive special benefits proportional to their assessment amounts and corresponding voting weight. The City's counsel also argued: "To address the issue of where did the public get notice of this 4.6 [SFE], we're ignoring there are pages and pages of assessment rolls on the back of [the] engineer's report that sets forth the calculation. And, for example, on . . . the assessment roll for the 2008/2009 assessment, it's set out very clearly that the 4.6 [SFE] for the Balboa Park parcel is there." Counsel further pointed out that the assessment roll specified the linear front footage and assessment amount for that parcel. However, the assessment roll's specification of the SFE and assessment amounts for the City's park and open space parcels sheds no light on how those figures were determined. Simply stated, notice of the *amount* of an assessment is not notice of the *basis* for an assessment.[15]

Because the City has not met its burden of showing that the assessment amounts charged against its park and open space parcels were proportional to the special benefits conferred on those parcels, we cannot conclude that the

[15] Counsel may have been suggesting that the park parcel's 4.6 SFE was based on the parcel's linear front footage. As noted, however, the engineer's report explained that a parcel's linear front footage and its SFE are separate components used to calculate the amount of the assessment against the parcel, 75 percent of the assessment being based on the SFE and 25 percent being based on the linear front footage. The SFE is not based on linear front footage.

vote the City cast for those parcels was properly weighted under article XIII D, section 4, subdivision (e).

The Association argues the City's failure to explain the assessment amounts for the open space and park properties should result in nullification of the City's entire vote for those properties, which would reduce the weighted vote in favor of forming the District to a minority. It is undisputed that the City voted 95 properties and that 90 of them were park or open space property. The City attached a list of its properties in the District, with corresponding assessment amounts, to its opposition to the Association's trial brief. The Association identifies the first five properties on that list as a fire station, consisting of two parcels, with a combined assessment (rounded to the nearest dollar) of $653; a youth center, with an assessment of $310; a City transportation facility, with an assessment of $7,305; and a commercial property, with an assessment of $452.[16] The sixth property, with an assessment of $2,255, is part of Balboa Park. The remaining 89 are the properties that the City conceded at trial were open space land.

The total 2007 assessment for the City's 95 properties was $35,160. The total assessment for the five developed properties, excluding the Balboa Park parcel, was $8,720. Thus, the difference between those amounts, $26,440, was the total assessment for the City's open space properties and Balboa Park parcel. If the City's vote for the park and open space properties were entirely invalidated, the assessment amount of the votes favoring formation of the District would be reduced (in rounded numbers) from $123,267 to $96,827, and the vote opposing formation in the assessed amount of $105,236 would prevail.[17]

---

[16] The record ties the assessment amounts for these properties only to parcel numbers and street addresses for four of the properties and to a parcel number with no street address for the $7,305 assessment that, according to the Association, is for the transportation facility. However, the City does not dispute the Association's representations regarding the character of the City-owned properties on the assessment roll as open space or developed, or representations regarding the uses of the City's developed properties. The addresses listed for most of the City's developed properties further supports the Association's representations.

[17] The Association incorrectly argues that under article XIII D, section 6, subdivision (b)(5), the City's vote for the fire station and transportation facility parcels should also be invalidated because the City failed to prove that those parcels have any function other than furnishing general governmental services. Article XIII D, section 6, subdivision (b)(5) provides in relevant part: "No fee or charge may be imposed for general governmental services including, but not limited to, police, fire, ambulance or library services, where the service is available to the public at large in substantially the same manner as it is to property owners." The Association misconstrues this language to mean that an assessment cannot be levied against any government-owned real property that is used to provide general governmental services such as fire or police services. However, the quoted language concerns the *purpose of fees and charges*, not the *use of public property* subject to *special assessments*.

At trial, the City argued that the SFE for its open space parcels should not be reduced to zero, and that if it were reduced from to 4.6 to one (the SFE assigned to vacant lots in the engineer's report), the vote in favor of forming the District would still prevail. It is not our place to determine the proportionate special benefit the City's open space parcels would derive from the proposed special assessment in this case, or to determine the basis upon which the amount of the special assessment against those parcels should be calculated, as those are factual matters properly addressed by an assessment engineer. Because the administrative and trial court record does not reveal the basis for calculating the assessment amounts levied against the City's open space property, in determining the validity of the election on the formation of the District, we conclude it is appropriate to eliminate those amounts from the weighted vote.

■ As noted, in the prayer of their 2007 complaint, the Association requested an order that "the [District] be dissolved, if it appears after review that the weighted value of the 'yes votes' cast after fair apportionment of the City vote is less than the weighted value of the 'no votes' cast in the July 30, 2007, election." We conclude that a writ of mandate vacating the resolution establishing the District is the most appropriate means of accomplishing that result. The fact that the Association did not specifically tie its request to dissolve the District to their mandamus cause of action does not preclude our directing the issuance of such a writ. (See *Valdez v. Himmelfarb* (2006) 144 Cal.App.4th 1261, 1276 [51 Cal.Rptr.3d 195] [failure to pray for the proper form of relief is not fatal to a complaint]; *Dicker v. Bisno* (1957) 155 Cal.App.2d 554, 558 [318 P.2d 159] [plaintiff in a contested case may secure greater relief than that requested in prayer].) The Association's prayer for mandamus relief compelling compliance with article XIII D, along with their specific request to dissolve the District, was sufficient for the trial court to direct the issuance of a writ vacating the resolution forming the District. Accordingly, we will direct entry of a judgment to that effect.

Article XIII D, section 4, subdivision (a) states that "[p]arcels within a district that are owned or used by any [local governmental] agency . . . shall not be exempt from assessment unless the agency can demonstrate by clear and convincing evidence that those publicly owned parcels in fact receive no special benefit." Thus, governmental real property is properly assessed for services and improvements that provide special benefit to the property regardless of the property's *use or function*. The plain meaning of the provision in article XIII D, section 6, subdivision (b)(5) prohibiting fees or charges for general governmental services is that *fees and charges* (and, arguably, assessments, which are different from fees or charges) may not be imposed against real property to recoup the cost of providing general governmental services. Nothing in article XIII D, section 6, subdivision (b)(5) prohibits government-owned real property used to provide general services from being included in a special assessment that meets the requirements of article XIII D, or from being included in the vote to form an assessment district.

*Separation of General Benefits from Special Benefits*

The Association contends and the trial court found that the engineer's report supporting the District assessments failed to adequately separate general benefits from special benefits as required by article XIII D. Article XIII D, section 4, subdivision (a) provides that "[o]nly special benefits are assessable, and an agency shall separate the general benefits from the special benefits conferred on a parcel." Article XIII D does not explain what it means to separate general benefits from special benefits or provide any methodology for doing so. However, the Court of Appeal in *Beutz, supra,* 184 Cal.App.4th 1516, thoroughly explained article XIII D's benefit-separation requirement.

In *Beutz,* the County of Riverside formed a special assessment district consisting of all residential properties in the community of Wildomar to pay the costs of maintaining landscaping in three closed public parks and one new park in the community. The landscaping assessment was part of a master plan to acquire and develop the parks. (*Beutz, supra,* 184 Cal.App.4th at pp. 1519, 1525.) The engineer's report for the assessment listed the special benefits that maintaining the landscaping would confer on the assessed properties. Regarding general benefits, the report stated: " 'It is recognized that the general public may benefit from these parks. However, the benefits to the general public will be offset by the County's payoff of the debt incurred by [the Ortega Trail Recreation and Park District], when [the County] acquired the park properties. The payoff totaled $633,992. Additionally County Funds of approximately $6,000,000 will be used to refurbish the parks with new playing fields, landscaping, structures, and other recreational appurtenances. Also on an annual basis the County proposes to contribute approximately $75,000 for the purpose of funding recreational programs.' " (*Id.* at p. 1527.)

Regarding the required separation of general and special benefits under article XIII D, the *Beutz* court quoted the following discussion from a pamphlet issued by the Legislative Analyst's Office in December 1996 explaining Proposition 218: " 'Local government must use a professional engineer's report to estimate the *amount* of special benefit landowners would receive from the project or service, as well as the *amount* of "general benefit." This step is needed because Proposition 218 allows local government to recoup from assessments only the proportionate share of cost to provide the special benefit. That is, if special benefits represent 50 percent of total benefits, local government may use assessments to recoup half the project or service's costs. Local governments must use other revenues to pay for any remaining costs. This limitation on the use of assessments represents a major change from the law prior to Proposition 218, when local governments could recoup from assessments the costs of providing both general and special benefits.' " (*Beutz, supra,* 184 Cal.App.4th at p. 1532.)

Thus, the *Beutz* court noted, "separating the general from the special benefits of a public improvement project *and* estimating the *quantity* of each in relation to the other is essential if an assessment is to be limited to the special benefits," as required by article XIII D, section 4, subdivision (a). (*Beutz, supra*, 184 Cal.App.4th at p. 1532.) The *Beutz* court found that the engineer's report in that case did not comply with article XIII D, section 4, subdivision (a) because it did not "*separate and quantify* the general and special benefits to be realized from the implementation of the entire Master Plan. Instead, the Report assumes—without supporting evidence or analysis—that the general benefits of the Master Plan will be 'offset' by the County's expenditures of over $6,633,992 to acquire and refurbish the parks and retire park debt, and its anticipated annual expenditures of approximately $75,000 to fund park recreational programs. The magnitude of the County's expenditures relative to the amount of the annual assessments begs the question, however, of whether the general benefits of the parks outweigh the special benefits to district properties in the proportion the [Engineer's] Report suggests." (*Beutz*, at pp. 1532–1533.)

The *Beutz* court concluded that the engineer's report was deficient in two ways. First, it was missing "an analysis of the *quantity* or extent to which the general public may reasonably be expected to use or benefit from the parks in relation to the *quantity* or extent to which occupants of Wildomar residential properties, either in the aggregate or individually, may use or benefit from the parks." (*Beutz, supra*, 184 Cal.App.4th at p. 1533.) Second, the report was missing "an analysis . . . of how or to what extent *all* Wildomar residential properties in the aggregate, or specific Wildomar residential properties in particular, will specially benefit from their occupants' anticipated use of the parks. [Citation.] It is by no means clear from the Report that occupants of Wildomar residential properties will use or benefit from the parks in a different manner, or more intensively, than persons from other communities. Nor does the Report address whether Wildomar residents who live in close proximity to one or more of the parks may reasonably be expected to use those parks just as often, over time, as Wildomar residents who live several miles away from the same parks." (*Ibid.*)

The *Beutz* court found those deficiencies in the engineer's report were of constitutional proportions because the report failed to "satisfy the County's two-part constitutional burden of demonstrating that (1) the parks [would] confer special benefits on all Wildomar residential properties, and (2) the amount of the assessment on *each* Wildomar residential parcel [would be] 'proportional to, and no greater than,' the special benefits conferred on that parcel. (Art. XIII D, § 4, subd. (f).)" (*Beutz, supra*, 184 Cal.App.4th at pp. 1533–1534.) The *Beutz* court noted that if the engineer's report had "*separated and quantified* the general and special benefits of the Master Plan based on solid, credible evidence and purported to base the assessment solely

on the special benefits, the substantial evidence standard of review may have applied to the Report's implicit conclusions that all Wildomar properties would specially benefit from the parks in equal measure, and that the assessment on each parcel was proportional to and no greater than those special benefits. [Citation.] The Report, however, fail[ed] to explain the nature and extent of the general and special benefits of the parks or quantify both in relation to each other based on credible, solid evidence." (*Id.* at p. 1534.)

■ We agree with the *Beutz* court's repeated emphasis that the general and special benefits conferred on real property by a service or improvement for which a special assessment is to be levied must be *separated and quantified*. Generally, this separation and quantification of general and special benefits must be accomplished by apportioning the cost of a service or improvement between the two and assessing property owners only for the portion of the cost representing special benefits. That is, the agency must determine or approximate the percentage of the total benefit conferred by the service or improvement that will be enjoyed by the general public and deduct that percentage of the total cost of the service or improvement from the special assessment levied against the specially benefitted property owners.[18] (*Beutz, supra*, 184 Cal.App.4th at p. 1532 [noting that if special benefits represent 50 percent of total benefits, local government may use assessments to recoup half of a project's or service's costs, and that to limit an assessment to special benefits as required by art. XIII D, § 4, subd. (a), the quantity of general and special benefits must be estimated in relation to each other].)

Like the engineer's report in *Beutz*, the engineer's report here did not attempt to separate and quantify the general and special benefits that the proposed services and improvements would confer. Regarding general benefits, the report stated: "The proceeds from the District will be used to fund the installation, maintenance and servicing of improvements within the District that, in the absence of the District, otherwise would not be provided. Properties in the District directly and specifically benefit from the Services, while properties outside the District do not receive the benefit of the Services funded by the District. Therefore, the assessments provide special benefit to property in the various Districts over and above the general benefits conferred

---

[18] A hypothetical example of such apportionment would be that if property owners are to be specially assessed for street lighting that will provide both a special benefit for residents of the street and a general benefit to the general public using the street, a reasonable separation and quantification of general and special benefit would be to determine the approximate percentage of daily (or nightly) trips on the street made by the specially benefitted residents as opposed to other members of the public and recoup only that percentage of the cost of the lighting through the special assessment.

by the general facilities of the City, and the Services funded by the District are determined to be exclusively of distinct and special benefit to properties in the District."

The statement in the engineer's report that "the assessments provide special benefit to property in the various Districts over and above the general benefits conferred by the general facilities of the City . . ." does not establish that the assessments would not also provide *general* benefit in addition to special benefit. As the *Beutz* court noted, "[the] courts of this state have long recognized . . . that virtually all public improvement projects provide general benefits." (*Beutz, supra,* 184 Cal.App.4th at p. 1531.) Here, the statement in the engineer's report that "*properties* outside the District do not receive the benefit of the Services funded by the District" (italics added) does not establish that the *general public* within and outside the District would not receive some benefit from those services. A number of the services specified in the engineer's report, including trail beautification, homelessness patrolling, Web site information, and special events, provide obvious benefit to the general public. The engineer's report's definition of "servicing" includes "the furnishing of electric current, or energy, gas or other illuminating agent for any public lighting facilities." Public lighting clearly provides a benefit to the general public in addition to any benefit that properties located in the vicinity of such lighting enjoy, and one of the properties to be assessed in the District is a portion of Balboa Park that includes a golf course. Like the parks at issue in *Beutz,* the park property in the District is unquestionably used by members of the general public outside the District. Thus, as the trial court ruled, there is no foundation for the statement in the engineer's report that "the Services funded by the District are determined to be exclusively of distinct and special benefit to properties in the District."

■ The engineer's report actually acknowledges that the subject services and improvement would confer *some* general benefit by concluding that "[a]ny general benefits from the Services are determined to be *minimal* and are more than offset by the significant other contributions the City provides to property in the District." (Italics added.) Because article XIII D, section 4, subdivision (a) provides that "[o]nly special benefits are assessable" (italics added) even *minimal* general benefits must be separated from special benefits and quantified so that the percentage of the cost of services and improvements representing general benefits, however slight, can be deducted from the amount of the cost assessed against specially benefitting properties. The City's failure, through the engineer's report, to separate and quantify the general and special benefits provided by the proposed assessment renders the assessment and formation of the District constitutionally infirm.

*Conclusion*

Our determination that the vote establishing the District is invalid and that the City's failure to separate and quantify the general and special benefits provided by the proposed assessment renders the assessment and formation of the District invalid under article XIII D is dispositive. All other issues raised in the Association's complaints and this appeal are moot.

## DISPOSITION

The trial court is directed to vacate the judgment and enter a new judgment granting the Association's petition for writ of mandate filed in 2007 and ordering the issuance of a writ vacating the City's resolution No. R-302887 forming the District and invalidating the assessments imposed by the District. The parties shall bear their own costs on appeal.

Benke, Acting P. J., and Nares, J., concurred.