Filed 11/23/15  San Diegans for Open Govt. v. City of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent. | D065929<br><br><br>(Super. Ct. No. 37-2013-00062908-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Timothy B. Taylor, Judge.  Affirmed.

Briggs Law Corporation, Cory J. Briggs and Mekaela M. Gladden for Plaintiff and

Appellant.

Jan I. Goldsmith, City Attorney, Carmen A. Brock, Deputy City Attorney;

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Ryan Thomas Dunn for

Defendant and Respondent.

Plaintiff and appellant San Diegans for Open Government (Plaintiff), a nonprofit

taxpayer and voter organization, sued defendant and respondent City of San Diego (City)

and another governmental entity for declaratory and other relief, to challenge the legality of 2014 fiscal year City budget resolutions that authorized (1) the levy and collection of assessments on property owners within previously established "maintenance assessment districts" (MADs) without making any changes in the assessments, and (2) the appropriation and expenditure of the funds collected. The resolutions recite that the assessment funds are used for special benefits for the assessed parcels, by providing the improvements and services described in the civil engineers' reports submitted for each of the districts.

The City ordinances forming the MADs, dating back to 1969, enabled the imposition of assessments on district property owners to pay for improvements and maintenance to properties in the districts, pursuant to the Landscaping and Lighting Act of 1972 (the LLA). (Sts. & Hy. Code, § 22500 et seq.; San Diego Mun. Code, §65.0201 et seq.) The procedures for this form of local revenue raising are required by article XIII D of the California Constitution, part of the statewide reform structure for levies and collections created by voter initiative Proposition 218, a successor to Proposition 13.[1] (Art. XIII A; arts. XIII C and XIII D were added through Prop. 218 in 1996, and further amended by Prop. 26 in 2010.)

Plaintiff's action seeks declaratory, injunctive or mandamus relief to establish that the MAD resolutions are invalid under the California Constitution, or to compel the City

---

[1]     All further article references are to the California Constitution. Under article XIII D, section 3, subdivision (a), "No tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership except: [¶] . . . [¶] (3) Assessments as provided by this article."

2

to refrain from imposing the assessments without obtaining two-thirds electoral approval as required for "special taxes," pursuant to article XIII A, section 4, and article XIII D, section 2, subdivision (d).[2] (Code Civ. Proc., §§ 1060; 1085, 1094.5; all further statutory references are to this code unless noted.) Plaintiff characterizes the City resolutions and assessments as merely illegal tax schemes that violate the standards and definitions of articles XIII A, XIII C and XIII D. The trial court dismissed the action after sustaining the City's demurrer to the second amended complaint (SAC) without leave to amend, for lack of standing and failure to state a cause of action, and Plaintiff appeals.[3]

Plaintiff contends the trial court should have recognized that it successfully pleaded, as a matter of law, that the resolutions implementing the MAD assessments fail to comply with the principles of articles XIII A and XIII C, when read together with article XIII D. Essentially, Plaintiff attacks the manner in which continuing resolutions were enacted by claiming, as a factual matter and without support in the record, that we

---

[2]     Article XIII A, section 4, states: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." Under article XIII C, section 2, subdivision (a), "All taxes imposed by any local government shall be deemed to be either general taxes or special taxes." A special purpose district or agency, such as the MADs, has no power to levy general taxes (*ibid*.), and Plaintiff argues these assessments are equivalent to local special taxes. Under article XIII C, section 2, subdivision (d), "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote."

[3]     Although Plaintiff also sued the County of San Diego in this action based on its function of property tax collection on behalf of the City, no allegations are made against it and the court dismissed the action as to all parties. The County did not file a respondents' brief.

3

can determine as a matter of law that inadequate supporting documentation for the continuing resolutions for these MADs was prepared to satisfy the requirements set forth in article XIIID, section 4, subdivision (a) (engineer's report separating and quantifying special and general benefits).

Plaintiff asserts it has standing to sue on these claims on behalf of its members, who are voters living in or near the city of San Diego, and who seek to vindicate public interests. (See *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 439-440 (*Common Cause*) [independent basis for citizen standing, without taxpayer standing, allowed for mandamus action to vindicate an alleged public right to voter outreach programs].) Plaintiff predicates its claims on the constitutional provisions applicable to special taxes, and asserts these assessments are no different and that they violate equal protection principles that have been developed in the voting rights arena. (See, e.g., *Harper v. Virginia State Bd. of Elections* (1966) 383 U.S. 663, 665 [once franchise is granted to the electorate, drawing of lines inconsistent with the equal protection clause is forbidden, such as imposing poll tax].) Plaintiff alternatively argues that leave to amend the SAC on unspecified grounds should have been granted.

"Courts are familiar with the process of determining the constitutionality of the taxes, fees, and assessments that local governments impose," and will apply independent review to the legal questions presented. (*Silicon Valley Taxpayers Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 449 (*Silicon Valley*).) As we will show, Plaintiff's allegations must be read in view of established rules of constitutional law that taxes and assessments have " 'very different' " natures, based in

4

part on the distinctions between the general voting schemes allowed by article XIII C for the imposition of taxes, compared to the special weighted voting methods created by article XIII D for the imposition of assessments. (*City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756, 782-784 (*Shapiro*) [invalidating a special tax]; *Silicon Valley, supra,* 44 Cal.4th at p. 442.)

Articles XIII C and XIII D prescribe the applicability of City-wide voting rights for imposition of special taxes, but they also provide for other methods of levies and collections, such as the special assessments procedure for charging property owners in a district for improvements and maintenance. (Art. XIII D, § 4.) These two constitutional revenue raising schemes are analogous but not identical. (*Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 682.) " '[A] special assessment is a charge levied against real property within a particular district for the purpose of conferring a special benefit on the assessed properties beyond any benefit received by the general public.' " (*Shapiro, supra*, 228 Cal.App.4th 756, 761.) In contrast, " '[a] "special tax" . . . is imposed to provide benefits to the general public [citation], and it is possible that those who are burdened by the tax may enjoy no benefit from its expenditure.' " (*Id.* at p. 782; art. XIII C, § 2, subd. (d) [no special tax allowed without two-thirds vote of electorate].)

Moreover, although elections pertaining to *special taxes* under article XIII C, section 2, " 'do not permit property qualifications,' " (*Greene v. Marin County Flood Control and Water Conservation Dist*. (2010) 49 Cal.4th 277, 297 (*Greene*)), the constitutional rules are different for the "sui generis" procedures for property-based

5

*special assessments* imposed under article XIII D. (*Greene*, *supra*, at p. 295; *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 841-842 (*Apartment Assn.*) [art. XIII D, §§ 2, 3 may permit exactions levied solely by incident of property ownership, if constitutional prerequisites are satisfied].)[4]

To support its claims that the MAD resolutions are invalid, the SAC alleges "[f]undamentally, this is a lawsuit about voters' rights" concerning tax increases, but its subject is the special assessment schemes that have largely been in place since 1989. The challenged 2014 resolutions simply continue the assessments previously voted on by property owners within the existing MADs. As the exhibits to the SAC and other portions of the record show, the MADs provide more frequent and enhanced services in a district than would otherwise be provided in the City at large. Article XIII D imposes constitutional restrictions on such assessment schemes, preventing them from requiring property owners to pay for general benefits that are not specific to their properties. (*Town of Tiburon v. Bonander* (2009) 180 Cal.App.4th 1057, 1074 (*Bonander*) [a valid assessment must meet both procedural and substantive requirements under art. XIII D].)

---

[4] "Proposition 218 together with its subsequent implementing legislation [Gov. Code, § 53750 et seq.] provides specific, sui generis procedures for conducting assessment protest balloting, and permits local government agencies to use similar procedures in conducting fee elections." (*Greene, supra*, 49 Cal.4th at p. 295.) These include procedures for creating and tabulating assessment ballots on a weighted basis, depending on proportional financial obligation of the affected properties within an assessment district, as well as protest procedures. (Art. XIII D, § 4, subds. (a), (e); art. XIII D, § 6, subd. (a); *Golden Hill Neighborhood Assn., Inc. v. City of San Diego* (2011) 199 Cal.App.4th 416, 422-423, 432 (*Golden Hill*).)

6

Under article XIII D, local agencies are required to distinguish between funding for improvements that create special and general benefits. Although members of the public may generally benefit from the improvements paid for by special assessments, either within or outside of an assessment district, it is well accepted that the affected property owners do not bear the entire financial burden of such general benefits. (*Silicon Valley, supra,* 44 Cal.4th at p. 443 [general benefits from assessments are not restricted to benefits conferred outside the assessment district, but can include benefits either "conferred on real property located in the district or to the public at large"]; *Greene, supra*, 49 Cal.4th 277, 290, 297; *Golden Hill, supra,* 199 Cal.App.4th 416, 422 [property owners prevailed on their arguments that assessment district was invalidly designed and the general vs. special benefits from assessments were incorrectly calculated].)

Because of these constitutionally-based distinctions, the fact that an existing assessment scheme may operate to confer not only special benefits on the subject property owners within its district, but also ancillary benefits to the general public, does not transform the assessment scheme into a special tax that is subject to separate constitutional requirements. (Art. XIII C, § 1, subd. (e)(7) [assessment under art. XIII D excluded from definition of taxes].) Our examination of the face of the pleading persuades us that Plaintiff has not set forth sufficient facts to create a legal basis for asserting that City-wide voting, such as a special tax would require, is a prerequisite for the enactment of valid City resolutions that continue previously imposed property based special assessments by the MADs. Moreover, the issue of standing to sue is inextricably intertwined with the merits of the claim. Plaintiff's legal and factual assertions about a

7

lack of constitutional voting protections for all City voters, in the establishment and funding of the MADs that control special assessments made on district property owners, are wholly conclusory and without support in the law. (*Chiatello v. City and County of San Francisco* (2010) 189 Cal.App.4th 472, 480 (*Chiatello*).) Plaintiff has not shown how it can allege any right to redress for any injury that was incurred solely in its members' capacities as taxpaying City voters, or any logical nexus between its members' voting status and the MADs. (*Id.* at p. 495; *Common Cause, supra*, 49 Cal.3d at p. 439.)

Even assuming that some district property owners could bring their own action to make a showing that the relevant engineers' reports fell short of constitutional standards, by not documenting adequately the quantification and separation of special and general benefits for the MADs, the validity of the previously established assessment districts is not squarely presented by this pleading, which merely attacks the voting procedures underlying the yearly resolutions which continue the MADs and appropriate the funds. Further, any lack of supporting documentation for a particular assessment does not, as a matter of law, demonstrate for pleadings purposes that the resolutions are unlawful on their face. The gist of the SAC and its voter injury theory cannot be corrected, and it fails to allege sufficient facts to support a theory that the MAD resolutions fail to comport with the substantive and procedural protections provided by Proposition 218 to City residents. (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747 [no leave to

amend necessary if complaint is facially incapable of amendment].)  We affirm the judgment of dismissal.[5]

I

*PLEADINGS MOTIONS AND RULING*

We review the demurrer ruling on the legal sufficiency of the SAC by exercising our independent judgment, to interpret and apply these constitutional and statutory provisions to the pleaded set of facts.  (*Silicon Valley, supra*, 44 Cal.4th at pp. 448-450.)  The courts need not accept pleaded allegations that are mere " 'contentions, deductions or conclusions of fact or law.' "  (*Chiatello, supra,* 189 Cal.App.4th at p. 480.)  We are required to give the SAC a reasonable interpretation, " 'reading it as a whole and its parts in their context.  [Citation.]  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.' "  (*Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035, 1041 (*Torres*).)

A.  Allegations:  Merits

The City demurred to previous versions of the pleadings, both of which challenged the MAD resolutions for the fiscal year 2014 (res. 308363 & 308364), passed in July 2013.  The SAC does not include those 2014 versions, but attaches in its exhibits A and B copies of several MAD resolutions from 2006 to 2012.  They concern approximately 30

---

5      The SAC originally included a first cause of action challenging a separate assessment scheme, the Downtown Property and Business Improvement District (PBID). Plaintiff and the City represent in their briefs that they reached a settlement of all claims in the first cause of action, and this appeal pertains only to the second cause of action attacking the MAD assessments.

of the 57 MADS that are the subject of the action. The MAD resolution exemplars show that the City council approved the updates to the engineers' reports supporting the proposed assessments and then declared its intent (1) to levy and collect assessments pursuant to previously established MADs, and (2) to authorize the appropriation and expenditure of funds collected. The resolutions recite that no majority protests were received and there were no proposed increases to the assessments, other than those authorized at the time the districts were formed, under the applicable consumer price index. The assessment funds are to be used for improvements and services that confer special benefits on the assessed parcels.

In exhibit B to the SAC, Plaintiff provides exemplars of supporting documentation for the resolutions, the civil engineers' reports submitted for various districts. They are presented as exhibits to a deposition (taken in another action) of a City retained civil engineer. A sample report, for the Newport Avenue MAD, explains that the district was formed in 1989 and reengineered in fiscal year 1998 for compliance with Proposition 218, and that weighted majority of property owners, based on an assessment amount, approved the assessments and the annual cost indexing provisions. The report describes the improvements to be maintained and the services to be provided in the area of landscaping, lighting, sidewalks, irrigation, drainage systems, waste disposal, and reporting of security and safety problems, all to be provided more frequently than would otherwise be generally allocated by the City. The reports set forth formulas and calculations for assessing the properties within a range as adjusted by the consumer price index.

10

Plaintiff alleges that for many years but especially in 2014, the City has been making MAD resolutions that incorrectly levy assessments on property owners within its 57 enumerated MADs, but without an essential City-wide vote to underlie them. At the City's public hearing on the 2014 MAD resolutions, Plaintiff opposed their approval, then filed this action contending they implement an illegal tax scheme to generate revenue, without obtaining voter approval of taxes. It also sued the County of San Diego based on its function of tax collection. (See fn. 3, *ante*.)

As voters and taxpayers, Plaintiff alleges that its members are harmed by the MAD system, due to their civic interests in assuring the validity of government revenue-generating schemes, whether they are or are not the ones liable for paying the tax, assessment, charge or fee. Plaintiff relies on authorities that Proposition 218 was intended to be liberally construed " 'to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.' " (*Silicon Valley, supra,* 44 Cal.4th at p. 448.)

To challenge the MAD resolutions as substantively improper, Plaintiff alleges, "[n]one of the levies approved by the 2014 MAD Resolutions constitutes an 'assessment' within the meaning of Section 2(b) of Article XIII D." Plaintiff further claims the MAD assessments do not qualify as "fees" or "charges" within the meaning of section 2(e) of article XIII D. Under article XIII D, section 2(h), Plaintiff argues the revenues collected pursuant to the 2014 MAD resolutions should not be used to pay for "property-related service."

11

As additional defects in the MAD resolutions, Plaintiff contends the City failed to require their supporting civil engineers' reports to justify the amount of the assessments, or to separate and quantify the general and special benefits provided by the MAD expenditures. (Art. XIII D, § 4, subds. (a), (b), (f) [setting forth procedures and requirements for assessments]). Because those engineers' reports are allegedly nonspecific, Plaintiff argues it is entitled to declaratory relief that the 2014 MAD resolutions were in violation of constitutional protections, and therefore the taxes authorized under them were invalid, and any attempt to collect the assessments should be enjoined. Legal fees and expenses were requested.

## B. Allegations: Standing

The SAC asserts that as a nonprofit taxpayer and voter organization, Plaintiff has standing to sue based on its representation of City voters and taxpayers. Although Plaintiff referred in the SAC to one unidentified member who was "assessed" one of the amounts pursuant to the MADs, it has not again relied on such an allegation either in its briefs on appeal or at oral argument.[6] More generally, Plaintiff claims it may have a

---

[6] Although we liberally construe the pleading in reviewing this ruling on demurrer, we do not ignore the thrust of Plaintiff's arguments on appeal, focusing entirely on its theories of voter injury and generalized taxpayer interests in public finance issues. We regard the omission of any appellate arguments about a member of Plaintiff having paid an assessment, or even being liable to pay an assessment, as a concession on appeal that it has no such members directly affected by the MADs system (property owners within such a district). Alternatively, Plaintiff forfeited any claim that it does have such assessed members. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [failure to discuss issue in briefs forfeits issue on appeal]; *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 118 [party waived appellate issue not raised in opening brief and not adequately supported in reply brief].)

member "who . . . is refraining from purchasing real property located within one of the MADs in substantial part because of the increased ownership cost posed by the taxes that are the subject of the 2014 MAD resolutions." One or more members owns rental units or businesses within the City and Plaintiff therefore asserts "an interest in land use and sustainable development."

Plaintiff also pleads that its members pay taxes to the City and they are concerned about general fund expenditures, as well as affordable housing. In general, its members are concerned about how the City goes about taxing and spending, and they allege entitlement to remedies for the harm incurred from their lack of an opportunity to vote on the revenue authorized by the MAD resolutions (which it characterizes as tax-based revenue). (§§ 1085, 1094.5.)[7]

C. Demurrer Proceedings and Ruling

On demurrer, the City chiefly argued that Plaintiff had failed to state sufficient facts to support its standing to sue, because it had not alleged it had members who were obligated to pay, or who had paid, any of the 2014 MAD assessment levies. (*Torres, supra,* 13 Cal.App.4th 1035, 1047 [for taxpayer standing under section 526a, the plaintiff must establish taxpayer status; but a consumer's payment of sales tax still amounts to a levy imposed upon the retailer, not the consumer].) The City also contended the MAD

---

7      Although the SAC cites to sections 1085 and 1094.5 as potential sources of remedies, it does not identify any administrative proceedings in need of correction, or any ministerial or discretionary legislative acts by City authorities that are properly subject to control through mandamus. (*Common Cause, supra*, 49 Cal.3d at p. 443.)

13

assessment scheme complied with all applicable requirements of articles XIII A, XIII C, and XIII D. (Gov. Code, § 53750 et seq., implementing Prop. 218.)

In support of the demurrer, the City sought judicial notice of copies of the 2014 MAD resolutions covering all 57 of the districts. The City moved to strike exhibit B to the SAC, the deposition taken in another action of the City's engineer whose firm prepared the attached reports that supported previous MAD assessments.

After hearing argument, the trial court ruled that the MAD cause of action did not adequately state facts to support its allegations of constitutional or structural defects in the City's method of revenue raising through the MAD resolutions. The court found there was no adequate allegation establishing that the MAD assessments are not in fact special property based assessments, as defined in article XIII C, section 1, subdivision (e)(7), which expressly excludes assessments and property related fees from the definitions of "taxes" that require voter approval. (Art. XIII D, § 2, subd. (b) [defining assessments]; *Silicon Valley, supra,* 44 Cal.4th 431, 443, 452 [under art. XIII D, § 2, subd. (i), "a special benefit must affect the assessed property in a way that is particular and distinct from its effect on other parcels and that real property in general and the public at large do not share."].)

Additionally, the trial court ruled Plaintiff lacked standing to assert injury to its beneficial interests, for lack of any proper claim that any of its members qualified for standing as having paid, or being obligated to pay, any allegedly illegal 2014 MAD levies, collections, or assessments. (§ 367 [real party in interest requirement for standing].) The court found inapplicable the analysis of the California Environmental

14

Quality Act (CEQA) standing requirements in *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 170 (*Save the Plastic Bag*) (held, a CEQA suit may be pursued by a corporation adversely affected by governmental action, that accordingly has developed a beneficial interest in challenging the action). Although some strict rules of standing have been relaxed where adverse environmental consequences are alleged, the beneficial interest requirement has not been abandoned. (*Ibid*., fn. 5.)

Further, the trial court found no support for the allegations of the SAC in *Common Cause*, *supra*, 49 Cal.3d at page 439, a mandamus case for enforcement of an alleged public duty to promote voter rights. Plaintiff had not alleged any such public duty or law in need of enforcement. Since this was the third attempt to plead an adequate cause of action, the court sustained the demurrer without leave to amend.

The court granted the City's motion to strike exhibit B of the SAC, the deposition attaching some engineers' reports in support of previous assessments. That ruling is not challenged on appeal, and in its opening brief, Plaintiff requests that this court consider those materials as background information. Following entry of judgment of dismissal, Plaintiff appealed.

II

*RULES FOR REVENUE RAISING BY*
*MAINTENANCE ASSESSMENT DISTRICTS; VOTER INJURY ANALYSIS*

When construing provisions added to the state Constitution by a voter initiative, we utilize principles of constitutional interpretation that are similar to statutory

15

construction rules. (*Silicon Valley, supra,* 44 Cal.4th 431, 444.) " ' "In interpreting a constitution's provisions, our paramount task is to ascertain the intent of those who enacted it. [Citation.] To determine that intent, we 'look first to the language of the constitutional text, giving the words their ordinary meaning.' [Citation.] If the language is clear, there is no need for construction. [Citation.] If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent." ' " (*Greene*, *supra*, 49 Cal.4th 277, 289-290.) Further:

> " 'Rudimentary principles of construction dictate that when constitutional provisions can reasonably be construed so as to avoid conflict, such a construction should be adopted. [Citation.] As a means of avoiding conflict, a recent, specific provision is deemed to carve out an exception to and thereby limit an older, general provision.' " (*Ibid.*)

We examine the allegations of the SAC to determine if Plaintiff has asserted entitlement to a judicial declaration that the 2014 MAD resolutions are violative of the principles of Proposition 218 and its creations, articles XIII C and XIII D. The constitutional procedural limitations upon a public agency's ability to impose assessments include notice and hearing requirements under article XIII D, section 4, subdivisions (c), (d) and (e), along with support from an engineer's report, and from the "vote of at least half of the owners of affected parcels, weighted 'according to the proportional financial obligation of the affected property.' (Art. XIII D, § 4, subds. (b) & (e))." (*Bonander*, *supra*, 180 Cal.App.4th 1057, 1074 [assessments on district parcels for costs of undergrounding utility lines were not proportional as to costs and special benefits].).) Article XIII D, section 4, subdivision (a) also has substantive requirements for a valid

16

assessment, that it must include the key findings of " 'special benefit and proportionality' " to the assessed parcels. (*Bonander, supra,* at p. 1074.)

## A.  General or Special Benefits

The first analytical problem is distinguishing between general benefits and special benefits.  Taxes are imposed to provide benefits generally to the electoral population. Special assessments under Proposition 218 provide not only special benefits to the assessed property owners within the district (e.g., increased frequency of maintenance services) but also general benefits to members of the public who visit or reside in the districts, but do not own property there.  At oral argument, counsel for Plaintiff used the example that anyone in an assessment district, such as renters or visitors, will generally benefit from improved lighting and street median beautification, as do owners.  Counsel argued that this court need not decide at this time whether these MAD levies and collections are actually taxes or assessments, apparently using the reasoning that any city taxpayer or voter is directly affected by any and all public finance mechanisms, especially taxes.  He pointed out that article XIII D, section 4, subdivision (f) places the burden on the governmental entity, upon a challenge in court, to demonstrate that the special assessment meets the requirements of conferring special benefits on the properties in question, and the proportionality of the assessments to the benefits conferred on the properties.

To answer the question of whether this challenge in court to the special assessments is well pled, we must look to the purpose of these constitutional enactments in light of the available enforcement mechanisms.  On the voter injury allegations, " 'we

17

must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' " (*Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.* (1973) 410 U.S. 719, 725 (*Salyer Land Co.*).)

The Supreme Court recognized in *Silicon Valley, supra*, 44 Cal.4th at page 431 that public improvements often provide both general benefits to the community and special benefits to a particular property. The court decided that assessments to fund acquisition and maintenance of open space in the County as a whole did not confer special benefits on the assessed properties. (*Id.* at pp. 450-456.) At the other end of the spectrum, payments for improved street access to a cul-de-sac that was unavailable to " 'thru-traffic' " did not confer any general benefits on City residents. (*Beutz, supra,* 184 Cal.App.4th at pp. 1530-1531, discussing *City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1225.) A county could justify assessments on residential properties, for costs of maintaining park landscaping, if it showed "those costs were proportional to, and did not exceed, the special benefits to the assessed parcels. (Art. XIII D, § 4, subds. (a), (f).)" (*Beutz, supra*, at p. 1536.) The courts acknowledge, "Any attempt to classify special benefits conferred on particular properties and to assign relative weights to those benefits will necessarily involve some degree of imprecision. . . . Whichever approach is taken to measuring and apportioning special benefits, however, it must be both defensible and consistently applied." (*Bonander, supra*, 180 Cal.App.4th at p. 1088.)

As set forth in *Bonander, supra*, 180 Cal.App.4th at page 1080, the court in *Silicon Valley, supra,* 44 Cal.App.4th 431 explained the relationship of special and

18

general benefits from assessments. It is clear under article XIII D, section 2, subdivision (i), that some sharing of special benefits among properties throughout a given assessment district does not make a benefit "general" in nature, such that an assessment then becomes invalid. (*Silicon Valley, supra*, at p. 452, fn. 8.) Thus, "in a properly drawn district— 'limited to only parcels receiving special benefits from the improvement—every parcel within that district receives a shared special benefit.' [Citation.] One might be tempted to characterize these shared special benefits as 'general' because they are not 'particular and distinct' or 'over and above' the benefits conferred on other properties in the district. *However, the Supreme Court stated it did not 'believe that the voters intended to invalidate an assessment district that is narrowly drawn to include only properties directly benefiting from an improvement*.' [Citation.] As the court explained: '[I]f an assessment district is narrowly drawn, the fact that a benefit is conferred throughout the district does not make it general rather than special. In that circumstance, the characterization of a benefit may depend on whether the parcel receives a direct advantage from the improvement (e.g., proximity to a park) or receives an indirect, derivative advantage resulting from the overall public benefits of the improvement (e.g., general enhancement of the district's property values).' " (*Bonander, supra*, at p. 1080, citing *Silicon Valley, supra*, at p. 452, fn. 8; italics added.)

In *Silicon Valley*, the Supreme Court acknowledged that in some cases, the provision of special benefits to the assessed properties may consequently provide incidental general benefits to the public, but to compensate, proportionality controls are imposed on the amounts assessed. "Under article XIII D, general benefits are not

19

restricted to benefits conferred only on persons and property outside the assessment district, but can include benefits both 'conferred on real property located in the district or to the public at large.' (Art. XIII D, § 2, subd. (i).) . . . By its plain language, section 2, subdivision (i), does not permit [the agency] to choose one segment of the 'public at large' to measure general benefit. The 'public at large' thus means all members of the public—including those who live, work, and shop within the district—and not simply transient visitors." (*Silicon Valley, supra*, 44 Cal.4th at p. 455; italics omitted.) The proper purpose of a special assessment, and proportionality, "is to require the properties which have received a special benefit from a 'public improvement' 'to pay the cost of that improvement.' " (*Id.* at p. 457, italics omitted.)

From this authority, it is only rational to conclude that the constitutional scheme for special assessments permits the creation of accompanying general benefits; if and when general benefits arise, the special assessments are not transformed into special taxes that are regulated separately. We next consider whether City voters, who are unquestionably entitled to receive general benefits from the special taxes they pay, are also entitled to challenge special assessments made against district property owners, on the grounds that ancillary general benefits are also provided. These City voters, as represented by Plaintiff, contend that they can enforce the special assessment scheme and thereby put the City to its proof of separation and quantification between the two types of benefits. We next examine whether Plaintiff has alleged voter injury of constitutional proportions. (See *Beutz, supra*, 184 Cal.App.4th at pp. 1533-1534.)

20

B. MAD Resolutions and Documentation

Plaintiff seems to be requesting a court order to require the City to redesignate the special assessments as special taxes, and call an election on the matter, and/or vacate its legislative acts authorizing the continuation of the MADs. (San Diego Mun. Code, § 65.0201 et seq.; but see *Common Cause, supra*, 49 Cal.3d at p. 442 [mandamus does not lie to control exercise of legislative discretion].) We turn to the text of the resolutions and their supporting documentation in the record, to determine if the SAC pleads meritorious challenges.

First, on the timeliness of this lawsuit, it has been held that Proposition 26 does not retroactively invalidate measures that were enacted before it became effective. (See *Brooktrails, supra,* 218 Cal.App.4th 195, 203.) In our case, the special maintenance assessment district ordinances, San Diego Municipal Code section 65.0201 et seq., were first added in 1969 and were reenacted in 1975, 1986, and 1998, and amended frequently. Although the attachments to the SAC are not up to date, there are 2012 to 2014 versions of the resolutions in the record. Exemplar engineers' reports in the record show that various assessment districts were established by weighted votes of the district property owners in 1989, 1994, 2000, and 2004, and that the City reengineered some districts after Proposition 218 was passed in 1996.[8] The 2014 resolution recites that it authorizes the

_____

8     The LLA, Streets and Highways Code section 22532, defines a property owner as including a successor to an owner on the assessment rolls, etc. The assessments are designed to run with the land within the district's territory. (Sts. & Hy. Code, § 22503 [benefited territory to be assessed].)

21

continued levy and collection of assessments within the self-managed MADs, and it does not reestablish or renew the original formation of the districts.

In the exemplar report submitted in support of the MADs, the engineers include as background information that the District was originally formed through property owner ballot proceedings, and the District owners approved the assessments and the annual cost indexing provisions. The report describes the maintenance and services to be performed, the costs, and the methodology for making assessments for special benefits, as adjusted by cost indexing provisions. The report explains that in the absence of the special assessments, maintenance and service would be provided at a less frequent level by city funded and administered programs that are provided to the public at large.

Plaintiff appears to be arguing that since our opinion in *Golden Hill, supra*, 199 Cal.App.4th 416, which invalidated that MAD formation and that district's collection of special assessments, was based on similarly generically worded engineers' reports, its conclusions should also control here. However, that was a different MAD (the Greater Golden Hill MAD) and there are 57 other MAD districts involved here. Further, the major defect in the assessments identified in *Golden Hill, supra*, 199 Cal.App.4th 416, was the failure of the supporting engineers' reports to separate and quantify "even minimal general benefits" from special benefits. (*Id.* at p. 439.) Such an analysis is required for assessments, so that the percentage of costs of "services and improvements representing general benefits, however slight, can be deducted from the amount of the cost assessed against specially benefitting properties." (*Ibid.*) The City's failure to

22

comply with those standards required the invalidation of those assessments and that district. (*Id.* at p. 420.)

It is not now before us whether the engineers' separation and quantification of special and general benefits in the continuing resolution for the MADS was adequate, as that is a fact intensive question. We do not have up-to-date MAD engineer's reports in the record, and the older ones were stricken by the trial court's ruling on the motion to strike.

Instead, the question before us is whether the challenged resolutions qualify as special assessments in light of constitutional requirements. This case is distinguishable from *Golden Hill, supra,* 199 Cal.App.4th 416, in which the plaintiffs were the assessed property owners, who therefore had standing to challenge the formation of a new district, and who were able to show that it disproportionately imposed incorrectly calculated assessments.

Here, however, Plaintiff is asserting voter injury and public interest grounds for invalidating the MAD resolutions. We next examine the applicable constitutional provisions to determine if the SAC should properly have survived demurrer.

C. Text of Constitutional Provisions on Special Assessments

The key allegation in the SAC is that the levies and collections authorized by the 2014 MAD resolutions constituted a "tax" within the meaning of article XIII A, section 4 (providing for locally imposed special taxes to be imposed only by a two-thirds vote of the qualified electors). Article XIII C, section 2, subdivision (d), likewise provides in relevant part: "No local government may impose, extend, or increase any *special tax*

23

unless and until that tax is submitted to the electorate and approved by a two-thirds vote." (Italics added.) However, under article XIII D, section 3, "(a) No tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership *except:* [¶] . . . [¶] *(3) Assessments as provided by this article*." (Italics added.)

Certain express exclusions from "tax" (as defined in art. XIII C, § 1, subd. (e), as "any levy, charge, or exaction of any kind imposed by a local government") are set forth as follows in article XIII C, section 1, subdivision (e)(7): "(7) *Assessments and property-related fees imposed in accordance with the provisions of Article XIII D.* [¶] The local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Italics added.)

Once the assessing district has been established and it has calculated a proposed assessment, under article XIII D, section 4, subdivision (d), the district must provide notice to owners of identified parcels within the district and supply them with a ballot, "whereby the owner may indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment." (*Ibid.*) Following the conducting of a hearing to consider all protests against the proposed assessment, the agency shall tabulate the ballots and shall not impose an assessment if there is a majority

24

protest. (Art. XIII D, § 4, subd. (e).) Such ballots shall be weighted according to the proportional financial obligation of the affected property. (*Ibid*.)

Article XIII D, section 4, subdivision (g), states in pertinent part: "Because only special benefits are assessable, electors residing within the district who do not own property within the district shall not be deemed under this Constitution to have been deprived of the right to vote for any assessment." (See *Shapiro, supra*, 228 Cal.App.4th at p. 782.)

Article XIII D, section 4, subdivision (f) states, "In any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question."

D. Asserted Public Interests in Voting: Comparison of Assessments to Taxes

The voting requirements under article XIII C for imposing special taxes are expressly qualified by exceptions under article XIII D, allowing local agencies to impose assessments, fees, and charges within constitutional limitations. (Art. XIII C, § 1, subd. (e)(7); *Apartment Assn., supra,* 24 Cal.4th 830, 838-839.) Plaintiff alleges it has adequately claimed, or could amend the SAC to claim, that the MAD resolutions do not fall within any applicable exceptions, as a matter of law. Plaintiff claims injury to its generalized voting rights under theories of equal protection and/or the general prohibition of wealth or property qualifications for voting. (E.g., *Harper v. Virginia State Bd. of*

25

*Elections*, *supra*, 383 U.S. 663, 665-666 [state has no right to dilute a citizen's vote on account of economic status; equality of voting power may not be evaded]; *Choudhry v. Free* (1976) 17 Cal.3d 660, 669 [in special case of large irrigation district, it was not proper to require property qualifications for that elective office]; *Shapiro, supra*, 228 Cal.App.4th 756, 780, fn. 23 [not reaching issue of propriety of property qualifications for tax measure election].)

" 'In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' " (*Salyer Land Co., supra,* 410 U.S. 719, 725.)  In that case, the high court rejected equal protection arguments against California voter qualification statutes for water storage district elections, stating the categories created were rationally related to the special purpose of the governmental entity, and elections for " 'such a body may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions.' " (*Id.* at pp. 720-721.)

In *Salyer Land Co.* the high court found no equal protection violation in a statutory framework for election of directors for a water storage district that focused on the land benefited, rather than on the individuals living there.  The court said the franchise in that special type of election was not controlled by the usual popular election requirements, such as one man, one vote.  (*Salyer Land Co.*, *supra*, 410 U.S. 719, 729-730.)  There, the high court also declined to apply the ban against property qualifications for voting to a weighted voting scheme according to assessed valuation of the land.

26

Because of the type of election involved, and the realities of the water storage district's operation, the court said it was appropriate to give greater influence in voting to those citizens most affected by the organization's beneficial actions. (*Id.* at pp. 729-730, 734.)

In *Golden Hill, supra*, 199 Cal.App.4th 416, this court acknowledged that the article XIII D assessment voting scheme provides a different or additional kind of voter protection. "Proposition 218's weighted voting requirement, set forth in article XIII D, section 4, subdivision (e), enhances taxpayer consent by giving property owners whose properties are proposed to be assessed in amounts greater than other owners' properties a proportionately greater say as to whether the proposed assessment will be instituted." (*Golden Hill, supra*, at p. 430.)

Thus, well-established principles in California constitutional law distinguish between the voting requirements for special taxes, and the "fee and assessment elections conducted by limited purpose government agencies that disproportionately affect certain property owners" in which property qualifications for electors are allowed. (*Greene, supra*, 49 Cal.4th at p. 297, fn. 8, citing, e.g., *Salyer Land Co., supra,* 410 U.S. 719, 728; *Southern Cal. Rapid Transit Dist. v. Bolen* (1992) 1 Cal.4th 654, 665; *Potter v. Santa Barbara* (1911) 160 Cal. 349, 355–356.) In that particular category of property-related elections, the courts do not apply the more general constitutional protections for individual voters such as secret ballot (art. II, § 7), or equal protection concerns such as enforcing "one-person one-vote," or a ban on wealth qualifications. (*Greene*, *supra*, at pp. 287, 291-295, 297, fn. 8.)

27

The decision in *Greene, supra*, 49 Cal.4th at page 295, was issued in the comparable context of imposition of fees (storm drainage fees) upon property owners in a flood control district. The Supreme Court interpreted article XIII D, sections 4 and 6 as authorizing fee election ballots on which voters are required to identify themselves, irrespective of whether weighted voting is used. In reaching its conclusions, the court discussed other constitutional election provisions, which require secret ballots and forbid property qualifications, but found they did not control over the Proposition 218 assessment approval/protest elections specifically required by article XIII D. For such assessment or fee elections, which are conducted by limited purpose governmental agencies and which disproportionately affect property owners within that jurisdiction, property qualifications may constitutionally apply. "There is no reason to suppose that the term 'election' has a core meaning of ballot secrecy when the specific constitutional provisions authorizing the election indicate otherwise." (*Greene, supra,* at pp. 284, 296-297, fn. 8.)

Plaintiff seeks to apply general election doctrines that promote equal protection (e.g., avoiding wealth discrimination) to this very specific, constitutionally authorized type of special election. No one can dispute the general proposition that voting rights are deserving of the utmost protection. However, Plaintiff does not explain away article XIII D, section 4, subdivision (g), stating: "Because only special benefits are assessable, electors residing within the district who do not own property within the district shall not be deemed under this Constitution to have been deprived of the right to vote for any assessment." (See *Shapiro, supra*, 228 Cal.App.4th at p. 782.) The same reasoning

28

indicates that electors residing outside of a district, and who do not own property there, have not been deprived of voting rights on MAD assessments.

In support of its expansive arguments, Plaintiff relies upon a comment in *Shapiro, supra*, 228 Cal.App.4th 756, regarding the projected economic effects of a special tax upon the larger community: "[D]espite the superficial normative appeal of allowing those who 'pay' for a tax to approve its imposition, it is often difficult to calculate the true economic incidence of any given tax." (*Id.* at p. 783.) In *Shapiro*, we thus acknowledged that when a *special tax* is concerned, to give only the affected landowners "a unilateral right to determine how to apportion the benefits that would flow from a tax whose burdens may well fall on others *would be contrary to both the Constitution and ordinary principles of taxation*." (*Id.* at pp. 783-784; italics added.) "If the voters who adopted Propositions 13 and 218 had desired that only qualified property owners be permitted to vote on the imposition of special taxes, they were clearly aware of the text to use to evince such intent. (See, e.g., art. XIII D, § 4, subd. (g) [referring to assessment ballot proceeding among 'property owners'])." (*Shapiro, supra,* at p. 782; italics omitted.)

Plaintiff's reliance on selected comments in *Shapiro, supra,* 228 Cal.App.4th 756 disregards the context in which they were made. We also said, "*the fact that Proposition 218 did expressly permit property owners to vote on certain assessments (art. XIII D)* provides strong support for the conclusion that the voters who enacted Proposition 218 did not intend to permit local governmental entities to impose property qualifications for electors *in elections involving taxes* (art. XIII C)." (*Shapiro, supra,* at p. 779; italics added.)

29

Plaintiff has no basis to claim that as potential purchasers of property or as potential renters, or as public spirited citizens, its members should be able to vote on the special assessments imposed upon properties they do not own. It is not enough for Plaintiff to insist that general individual voting rights are sacrosanct in the tax field, when the constitutional provisions in articles XIII C and XIII D expressly allow for different treatment of assessments. (*Greene, supra,* 49 Cal.4th at pp. 294, 297.) In *Chiatello*, *supra*, 189 Cal.App.4th 472, 495, the court applied the principles that for successfully alleging standing to assert a particularized injury, the plaintiff must set forth facts showing more than any " 'generalized grievance' " or a " ' "general interest common to all members of the public," ' " or even a grievance " 'shared in substantially equal measure by all or a large class of citizens.' " (*Ibid.*) The MAD assessments affect differently situated citizens differently, and impose their own set of protections, including weighted voting by district property owners and proportionality of amounts assessed, and hence, Plaintiff's City voters cannot bring themselves within that specialized population.

Under articles XIII C and XIII D, different types of levies and collections are authorized, not only taxes but also assessments, fees and charges. (*Howard Jarvis, supra*, 73 Cal.App.4th at p. 682.) Article XIII C, section 1, subdivision (e) itself created the exceptions for assessments to be made under article XIII D. Nothing has been proposed as amendments to make out a proper cause of action by Plaintiff that it incurred voting injury from a lack of opportunity to approve the identified special assessments.

## III

### STANDING ISSUES

#### A. Applicable Standards

The trial court resolved against Plaintiff the legal question of whether it could properly assert standing to sue on behalf of interested city voters or taxpayers, for its alleged constitutional or voter injury. The trial court determined the SAC did not adequately allege the existence of beneficial interests of Plaintiff's members that were injured through the operation of the MAD resolutions. These assessments were imposed on property owners, and Plaintiff does not assert its members included property owners. Since this was a dismissal after demurrer, requiring de novo review of the constitutional and statutory questions presented through analysis of the sufficiency of the pleading, we address as a separate and independent ground of this opinion whether the SAC properly presents Plaintiff's claim that the MAD assessments were not imposed within constitutional prerequisites. (See *Apartment Assn.*, *supra*, 24 Cal.4th 830, 839-840.)

" 'The question of standing to sue may be raised by demurrer.' " (*Chiatello, supra*, 189 Cal.App.4th 472, 481.) A basic requirement for standing is " 'that it focuses on the party seeking to get his complaint before a . . . court, and not [on] the issues he wishes to have adjudicated.' " (*Harman v. City and County of San Francisco* (1972) 7 Cal.3d 150, 159 (*Harman*).) However, the courts also recognize, " '[I]it is both appropriate and necessary to look to the substantive issues . . . to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated' in order to ascertain whether the plaintiff 'is a proper and appropriate party to invoke [the] judicial

31

power.' " (*Chiatello, supra*, 189 Cal.App.4th 472, 495, citing *Flast v. Cohen* (1968) 392 U.S. 83, 102.)

" 'The issue of standing is determined by the courts as a matter of policy. In large measure it depends on the fitness of the person to raise the issues.' " (*Chiatello, supra*, 189 Cal.App.4th 472, 481; *Harman, supra,* 7 Cal.3d at p. 159.) We ask whether Plaintiff has " ' "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." ' " (*Chiatello, supra*, 189 Cal.App.4th 472, 480-481.)

B. Analysis: Types of Interests Being Asserted for Standing Purposes

*1. Ownership of Property*

We initially note that the pertinent case law in the context of special assessments has been issued on challenges brought by property owners, or their associations, who were claiming that such assessments were constitutionally invalid or incorrectly calculated. In *Golden Hill, supra*, 199 Cal.App.4th 416, standing to sue was not an issue, because the objecting plaintiffs were an association of district owners and a named property owner. They prevailed on their arguments that the district was invalidly formed because of incorrectly weighted election methods, and that the supporting reports for the assessments did not adequately account for special versus general benefits. In *Beutz, supra*, 184 Cal.App.4th 1516, it was a resident of a special landscape assessment district who successfully sued the county seeking to void the assessment, as invalid under Proposition 218 and state constitutional limits on local property taxes.

32

In *Shapiro*, a special tax case, this court addressed challenges that did not involve standing concerns such as City residency. *(Shapiro, supra,* 228 Cal.App.4th 756.) For purposes of bringing a court challenge to a special assessment, liability for the assessment that is based on district property ownership, has usually been an implicit qualification for the plaintiff.

### 2. *Taxpayer Standing or Voter Injury*

Plaintiff's "voter injury" theory does not rely on taxpayer standing under section 526a, in which a "pay first litigate later" principle normally applies. (Art. XIII, § 32; *Chiatello, supra*, 189 Cal.App.4th at pp. 478, 484.) Plaintiff instead alleges that as voters living in or near the City of San Diego, its members share "an interest in ensuring open, accountable, and responsive government, and the protection of their rights as taxpayers and voters." But in *Chiatello*, the court acknowledged that standing to attack a public finance measure (such as a tax) requires more than the assertion of " 'only the right, possessed by every citizen, to require that the government be administered according to law and that public moneys not be wasted.' " (*Id.* at pp. 496-497.) A modern public finance measure such as a special assessment should not be subject to such a broad based challenge either.

Plaintiff's broad interpretation of standing doctrine was rejected in *Torres, supra,* 13 Cal.App.4th 1035, 1042 [no standing to challenge redevelopment measures by nonresident consumers who paid sales taxes for which merchants, not consumers, were ultimately liable].) Likewise, in *Reynolds v. City of Calistoga* (2014) 223 Cal.App.4th 865, 875, an out-of-county plaintiff could not show a "pointed" public need for standing

33

to sue a county in which he had paid some sales tax, on his theory that a city there had inappropriately used the proceeds of a special sales tax to fund environmental initiatives. The court declined to accord public interest taxpayers standing under section 526a, noting that the public interest exception to standing requirements normally applies only in mandamus proceedings. The court observed that other potential plaintiffs (i.e., in-county taxpayers) were available to challenge any incorrect allocation of public funds, and they were more likely to be "citizens with interests far more immediate" than Reynolds could claim. (*Ibid.*)

In *Andal v. City of Stockton* (2006) 137 Cal.App.4th 86, the plaintiff had standing to sue, as a business that was obligated to collect a tax from its customers. It challenged that tax because it was exposed to known adverse consequences if it did not collect them. (See *Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1317 [residents have valid interests in both revenue and expenditure aspects of taxes].) Here, Plaintiff does not even contend that any of its members paid or were liable to pay for any assessments based on their ownership of assessed property.

These novel theories on standing leave it unclear whether Plaintiff is actually "the object of the governmental action or inaction [it] challenges." (*Lujan v. Defenders of Wildlife* (1992) 504 U.S. 555, 562.) In such a case, "standing is not precluded, but is ordinarily 'substantially more difficult' to establish." (*Ibid*.) In addition to its assertions of voter injury, the SAC supports its standing allegations by referring to its stated interests in land use, sustainable development, general fund expenditures, and affordable housing, on a public interest theory. (*Common Cause, supra,* 49 Cal.3d at p. 439.) It

34

relies on mandamus allegations solely by citing to statutes authorizing such remedies, without substantive descriptions of what alleged duty the courts should be enforcing. (Code Civ. Proc., §§ 1085, 1094.5.) Likewise, its injunctive and declaratory relief allegations are general and leave much open to question about any logical nexus between the taxpaying status asserted, and the alleged defects in the MADs that are the subject of the SAC. (*Chiatello, supra*, 189 Cal.App.4th at p. 495.)

Plaintiff has not pled any beneficial interests in the assessment scheme that are "concrete and actual, and not conjectural or hypothetical," to support its allegations that the subject MAD resolutions are facially unconstitutional. (See *Chiatello, supra*, 189 Cal.App.4th 472, 480-481; *Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739, 751, fn. 6 ["We are aware of no state or federal case that recognizes 'voter standing' as a means of securing an advisory opinion on whether the Legislature has passed an unconstitutional statute."].) We do not think that the voters who passed Proposition 218 did a futile act when they created the article XIII D assessment exception to the definition of taxes (art. XIII C, § 1, subd. (e)(7)), simply because general benefits may also arise from special assessment work, and the district property owners should not have to pay for those general benefits, as well as their own special benefits.

Finally, although we may consider whether the SAC allegations may state a cause of action under any possible legal theory, no such amendments have been suggested. (*Grinzi v. San Diego Hospice* (2004) 120 Cal.App.4th 72, 85 [new theories may be advanced for the first time on appeal where pleading defects led to dismissal]; *City of Stockton v. Superior Court*, *supra*, 42 Cal.4th 730, 747 [appellate court could determine

35

that complaint was facially incapable of amendment].)  The trial court correctly dismissed the entire action.

## DISPOSITION

The judgment of dismissal is affirmed.  Respondent is awarded costs on appeal.


HUFFMAN, Acting P. J.

I CONCUR:


McDONALD, J.

AARON, J., Dissenting.

Section 1(e) of article XIII C of the California Constitution, provides that a "tax" is any "levy, charge, or exaction of any kind imposed by a local government," with certain exceptions. Thus, if a levy, charge or exaction imposed by a local government does not fall within one of the enumerated exceptions, it is, by definition, a tax. One of the exceptions in article XIII C is for "[a]ssessments and property-related fees imposed in accordance with the provisions of Article XIII D."

Relying on these constitutional provisions, appellant contends, in essence, that the 2014 MAD levies do not qualify as valid assessments because the levies were not imposed in accordance with the requirements and procedures set forth in article XIII D. Appellant further alleges that since the MAD levies are clearly " 'lev[ies], charge[s] or exaction[s],' " they are, under section 1(e) of article XIII C, a tax. Finally, appellant claims that if the MAD levies are in fact taxes then, under article XIII A, section 4, the electorate had the right to vote on them. ("Under Section 4 of Article XIII A, cities (including charter cities) may only impose special taxes by a two-thirds vote of qualified electors.")

This case is before us after the trial court sustained the City's demurrer without leave to amend. Thus, the only issue that is properly before this court is whether, *taking the well-pleaded allegations of the complaint as true*, appellant's complaint alleges facts sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) At this stage, appellant need not *establish* as a matter of law that the levies in

question do not meet the requirements of an exception to the definition of a "tax." Rather, appellant need only adequately allege such.

Section 4 of article XIII D, titled "Procedures and Requirements for All Assessments," sets forth the requirements that a local agency must meet to qualify a levy, charge or exaction as an "assessment" within the meaning of the exception in section 1(e)(7) of article XIII C. In particular, section 4(a) provides, "No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel." Section 4(b) provides in part, "All assessments shall be supported by a detailed engineer's report prepared by a registered professional engineer certified by the State of California." The engineer's report must estimate the amount of special benefit landowners would receive from the project or service and must separate and quantify the amount of special benefit landowners would receive from the project or service, as well as the amount of general benefit. (*Golden Hill Neighborhood Assn., Inc. v. City of San Diego* (2011) 199 Cal.App.4th 416, 436-437 (*Golden Hill*), citing *Beutz v. County of Riverside* (2010) 184 Cal.App.4th 1516, 1532.) This quantification generally must be accomplished by apportioning the cost of a service or improvement between general and special benefits and assessing property owners for only the portion of the cost that represents special benefits. (*Golden Hill*, *supra*, at p. 438.)

Appellant alleges that the required quantification did not occur with respect to the 2014 MAD levies. Specifically, appellant alleges that none of the levies imposed by the 2014 MAD resolutions constituted a valid "assessment" within the meaning of section 2(b) of article XIII D because, among other reasons:

2

"No portion of the 2014 MAD Engineer's Reports separates and quantifies the general and special benefits to be provided by the MADs during Fiscal Year 2014.

"No provision in Defendant CITY OF SAN DIEGO's contract with the engineers who prepared the 2014 MAD Engineer's Reports required the engineers to separate and quantify the general and special benefits to be provided by the MADs during Fiscal Year 2014.

"Prior to the 2014 MAD Resolutions' approval, Defendants had not prepared any 'writing' as defined by Evidence Code Section 250 that separates and quantifies the general and special benefits to be provided by the MADs during Fiscal Year 2014."

It seems clear that, taking these factual allegations as true, appellant has sufficiently stated a cause of action.

The majority fails to address the sufficiency of the allegations in the SAC and instead, addresses arguments different from the arguments that appellant raises. In doing so, the majority appears to *assume*, throughout, that the levies in question are valid assessments—the very issue that is disputed in this case. For example, the majority states, "Plaintiff predicates its claims on the constitutional provisions applicable to special taxes, and asserts these assessments are no different and that they violate equal protection principles that have been developed in the voting rights arena." (Maj. opn., *ante*, at p. 4.) The majority further states, "Our examination of the face of the pleading persuades us that Plaintiff has not set forth sufficient facts to create a legal basis for asserting that City-wide voting, such as a special tax would require, is a prerequisite for the enactment of valid City resolutions that continue previously imposed property based special assessments by the MADs." (Maj. opn., *ante*, at p. 7.) However, appellant does

3

not contend that the constitutional provisions that apply to special taxes should also apply to assessments, nor does appellant contend that city-wide voting is a prerequisite for City resolutions that continue previously imposed property-based special assessments. Rather, appellant contends that the levies at issue do not meet the constitutional requirements to qualify as assessments, that, as " 'lev[ies], charge[s], or exaction[s] . . . by a local government,' " they therefore constitute a tax, and that city-wide voting is a prerequisite for the imposition of such a tax.

In a similar vein, the majority asserts, "We next consider whether City voters, who are unquestionably entitled to receive general benefits from the special taxes they pay, are also entitled to challenge special assessments made against district property owners, on the grounds that ancillary general benefits are also provided." (Maj. opn., *ante*, at p. 20.) The majority goes on to state, "Plaintiff seeks to apply general election doctrines that promote equal protection (e.g., avoiding wealth discrimination) to this very specific, constitutionally authorized type of special election. No one can dispute the general proposition that voting rights are deserving of the utmost protection. However, Plaintiff does not explain away article XIII D, section 4, subdivision (g), stating: 'Because only special benefits are assessable, electors residing within the district who do not own property within the district shall not be deemed under this Constitution to have been deprived of the right to vote for any assessment.' [Citation]. The same reasoning indicates that electors residing outside of a district, and who do not own property there, have not been deprived of voting rights on MAD assessments." (Maj. opn., *ante*, at pp. 28-29.) In making these statements, the majority *presumes* that the levies at issue are

4

valid assessments, when that is the contested issue in this case. Further, the majority again misstates appellant's position, implying that appellant is arguing that any assessment that provides not only special benefits, but also ancillary general benefits, constitutes a tax. This is not appellant's argument.

The majority presumes that the levies in question are valid assessments—contrary to the allegations of the complaint, and fails to properly address whether, taking the allegations of the SAC as *true*, the complaint alleges facts sufficient to state a cause of action. The majority's analytical approach is antithetical to the proper review of the sustaining of a demurrer.

In addition, the majority opinion emphasizes throughout that what is at issue here is "an existing assessment scheme" (maj. opn., *ante*, at p. 7), implying that the requirements of article XIII D, section 4, do not apply to the levies at issue in this case. Specifically, the majority suggests that the constitutional requirements of quantification and separation do not apply to the annual levies after a MAD has been formed, and that it is therefore irrelevant whether the required quantification occurred. In this regard the majority asserts, "Even assuming that some district property owners could bring their own action to make a showing that the relevant engineers' reports fell short of constitutional standards, by not documenting adequately the quantification and separation of special and general benefits for the MADs, the validity of the previously established assessment districts is not squarely presented by this pleading, which merely attacks the voting procedures underlying the yearly resolutions which continue the MADs and appropriate the funds." (Maj. opn., *ante*, at p. 8.)

5

Appellant contends that the requirements of article XIII D, section 4, *do* apply to existing assessments. Article XIII D, section 5, specifically provides that these requirements apply to existing MADs, stating in relevant part, "Beginning July 1, 1997, all *existing*, new, or increased assessments shall comply with this article." (Italics added.) While section 5 "exempt[s] from the procedures and approval process set forth in Section 4" certain enumerated assessments, the allegations of the complaint do not establish that any of these exceptions apply to the levies in question, and there is nothing in the record of which the trial court took judicial notice that would establish that any of the exceptions apply as a matter of law. It is therefore improper to affirm the sustaining of respondent's demurrer on the basis that what is at issue is an existing assessment scheme.

For the foregoing reasons, I dissent.


AARON, J.


6